Filed 10/28/20  Strojan v. Strojan CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| LESLIE D. STROJAN, | C086485, C088137 |
| Defendant and Appellant, | (Super. Ct. No. STK-PR-TR-2013-0000756) |
| v. | |
| ELSIE I. STROJAN, | |
| Plaintiff and Respondent. | |

These consolidated appeals arise out of disputes related to the administration of the Walter G. Strojan and Elsie I. Strojan 2001 Family Trust (Family Trust).  Defendant Leslie Strojan (Les)[1] challenges a variety of rulings issued by the trial court following a three-day bench trial.  He contends the trial court erred in removing him as trustee of the Family Trust, denying his request for trustee fees, reducing his request for attorney fees

---

[1] Because all of the family members involved in this case share the same last name, we will refer to each by their first name to avoid confusion.

1

by 75 percent, and appointing plaintiff Elsie Strojan (Elsie) as temporary trustee during the pendency of his appeal from the judgment. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We summarize the facts in accordance with the usual rules on appeal. Specifically, we view the record and resolve all evidentiary conflicts in favor of the prevailing party. (*As You Sow v. Conbraco Industries* (2005) 135 Cal.App.4th 431, 454.) Additional information necessary to the disposition of this appeal is discussed below.

*The Strojan Family and the Property*

Walter Strojan (Walter) was a farmer and cattle rancher. In 1951 he married Elsie. They had two children, Les and Inette Strojan (Inette). Les was born in May 1951 and Inette was born around 20 months later.

In 1954 or 1955, Walter and Elsie purchased a 300-plus acre ranch in Farmington (the Property), which is located in San Joaquin County. The Property is not irrigated and has primarily been used for cattle grazing.

From a young age, Les assisted Walter with his farming and cattle ranching operations. Neither Elsie nor Inette aided Walter with these operations. Elsie did not graduate from high school or work outside the home. Walter handled the family's finances and made the decisions "[m]ost of the time." He did consult with Elsie prior to making business decisions.

In 1971 Walter and his family moved to the Property after the family home was built. In 1974 Les graduated from California State University, Fresno, with a Bachelor of Science Degree. In 1976 he married Mary Anne Strojan (Mary Anne). They have three children, Paul Strojan (Paul), Andy Strojan (Andy), and Kathleen Strojan (Kathleen). Inette never married and has no children.

From approximately 1974 to 2005, Les worked for the Farm Credit Bank as an agricultural banker. When he retired, he was the senior vice president of credit and the chief credit officer. He was responsible for setting the bank's lending standards and

chaired the bank's loan committee and asset liability committee, which was responsible for the bank's investments.  In addition to working as a banker, Les was a self-employed farmer and cattle rancher.

In 1979 Walter leased the Property, excluding the family home, to a third-party for cattle grazing pursuant to a written lease.  Under the terms of that lease, the rent was set at $32.50 per acre per year.[2]  The Property was leased from September 1979 to July 1980.[3]

In 1980 Les began grazing cattle on the Property.  Initially, he was equal partners with Walter; he leased half the Property under the terms of an oral lease.  This arrangement lasted for about 10 years.  Around 1990 Walter decided to "take his own ranch back," as Les was leasing several other "significant properties" and was "leveraged enough."  However, in the mid-1990s, Les began leasing the entire Property (306 acres), excluding the family home, for cattle grazing under the terms of an oral lease.  At that time, Walter was in his 80s and "couldn't stand the pressure of [cattle ranching] anymore."  The rent for the Property was originally set at $30 per acre per year, resulting in an annual rent of $9,180.  However, after the first year, the rent was reduced to $20 per acre per year, which lowered the annual rent to $6,120.  Walter reduced the rent because Les "didn't do very well at all" and Walter knew Les "couldn't operate the property for nothing."  Over the course of his time as a cattle rancher, Les leased multiple ranch

---

[2] In 1979 the Property was 320 acres.  The cattle grazing lease was for 313 of the 320 acres.  As a result, the yearly rent was $10,172.50, calculated as 313 acres multiplied by $32.50.  At some point in time, a portion of the Property was sold to the state for a highway project.  It is undisputed that the Property was 306 acres at all relevant times to the issues in this action.

[3] Walter leased the Property to the same individual for approximately seven years in the 1970s but there was no evidence presented at trial as to the terms of any lease agreement for that period.

properties for grazing. In total, he estimated that he was a party to about 35 to 40 oral grazing leases. He was also a party to at least one written lease for grazing.

At the trial, which took place in August 2017, Les estimated that the Property, which was unencumbered by debt, was worth about $1,500,000 to $2,000,000.

*The Family Trust*

In February 2001 the Family Trust was created. The trust instrument identified Les as the trustee and Walter and Elsie as the settlors and life beneficiaries. The assets of the trust consist primarily of the Property and two bank accounts. As relevant here, the terms of the trust require the trustee to pay Walter and Elsie the net income generated by the trust during their lifetimes and to add any undistributed net income to the principal of the trust estate. If the trustee determines that the net income is insufficient, the trustee has the discretion to distribute as much of the principal of the trust estate as deemed necessary for Walter's and Elsie's "proper health, education, support, maintenance, comfort, and welfare, in accordance with their accustomed manner of living at the date [the trust was created] without taking into consideration funds and assets available to them held free of th[e] trust."[4] The trust provides that either Walter or Elsie could revoke the trust during their lifetime, and that, if the trust is revoked, the Property in the trust must be returned to the settlors as either community property or separate property, depending on the character of the Property when it was transferred to the trust. At the death of the first settlor, the trust requires the trustee to divide the trust estate into two separate trusts, designated as the survivor's trust and the exemption trust, each of which comprises one half of the settlors' community property that is a part of the trust estate. Thereafter, the trustee is required to pay the surviving spouse the net income generated

---

[4] It is undisputed that there were funds available to Elsie outside the Family Trust, including cash in a bank account, social security payments, and monthly rent from a cell tower lease on the Property.

4

by the exemption trust as necessary, in the trustee's discretion, for the survivor's "health, education, support, and maintenance, in accordance with the survivor's accustomed standard of living at the date of the deceased spouse's death," and to add any income not distributed from that trust to the principal of the trust estate. The surviving spouse may amend, revoke, or terminate the survivor's trust but has no authority to take any such action with respect to the exemption trust. In other words, when the first settlor dies, the survivor's trust is a revocable trust and the exemption trust is an irrevocable trust. At the death of the surviving spouse, the trustee must distribute any remaining balance of the survivor's trust in any proportion that the surviving spouse appoints by will. Any remaining assets in the survivor's trust must be added to the exemption trust, which is to be distributed to Les and Inette in equal shares.

Under the terms of the Family Trust, the trustee's powers include, among other things, the discretion as to how much income to distribute to Walter and Elsie from the trust during their lifetimes, and the authority to manage and control trust property, including the authority to lease trust property and loan money from the trust, "provided any such loan [must] be adequately secured and [must] bear a reasonable rate of interest."

Walter and Elsie did not discuss the Family Trust prior to the preparation of the trust instrument. At the time the trust instrument was executed, no one explained the meaning of its provisions to Elsie, including the attorney who prepared the instrument. Elsie did not read the instrument before signing it. Neither Walter nor Les explained to Elsie "what the trust meant."

*Events Following the Creation of the Family Trust*

After the Family Trust was created, Les continued to lease the Property for cattle grazing under the terms of the oral lease he had entered into with Walter in the mid-1990s. There was no discussion of putting the lease into writing or changing the terms of the lease. Elsie never talked to Les about the lease. Les continued to pay $6,120 in yearly rent to Elsie. He did not seek the advice of independent counsel as to whether it

5

would be "okay as a fiduciary" to lease the Property to himself under the terms of the oral lease. However, according to Les, his business relationship with the trust was discussed with the attorney who prepared the trust instrument at the time of its execution. Les also claimed that, after Walter died, he asked the same attorney for advice. The attorney did not give him any specific instructions and did not advise him to enter into a written lease for the Property.

In February 2002 Walter died at age 90. Elsie was 75 years old. Following Walter's death, Les handled Elsie's finances. She provided him financial information so he could arrange for her tax returns to be prepared by an accountant. In addition to managing Elsie's finances, Les continuously managed the Property after Walter died. According to Les, he paid about $31,000 from his own funds for repairs and improvements.

In February 2003 Les took an unsecured $60,000 loan from the Family Trust without telling Elsie. The promissory note for the loan stated that the interest rate was "variable." The note did not specify a payment schedule or how the interest rate was to be calculated but provided that the loan was due "on demand."[5] Les did not consistently make payments on the loan and never discussed the terms of the loan with Elsie. When Les made payments on the loan, he paid whatever amount he wanted to pay. He never consulted an attorney as to whether the loan was a conflict of interest or otherwise improper in light of his role as trustee. Elsie learned about the loan for the first time in 2007 when Les provided her a one-page document summarizing her yearly income and

---

[5] At trial, Les claimed that Elsie agreed to loan him money from the trust because he would be paying a higher interest rate than the interest rate she could earn if her funds were placed in a bank account. According to Les, Elsie told him that it was unnecessary for him to secure the loan with the deed of trust on his home. When asked, Les explained that the intent of making the interest rate variable was to ensure that "the variable interest rate would always . . . exceed [Elsie's] alternative availability for earnings and . . . wouldn't . . . exceed what [he] could borrow the money [*sic*] from elsewhere."

6

expenses for tax purposes. Les did not explain the contents of that document to Elsie, including the terms of his loan.

In June 2004, at the direction of Elsie, Les loaned Inette $20,000 from the Family Trust. In June 2011 Les' son Andy borrowed $5,500 from the trust with Elsie's knowledge. The promissory notes for these loans included payment dates, payment terms, and interest rates.

In 2010 Elsie asked Les for a distribution from the Family Trust so she could replace her hearing aids. Les denied her request, claiming that she did not need new hearing aids. Elsie purchased new hearing aids on credit and was not reimbursed from the trust for that amount.[6]

After the Family Trust was created, Les leased a portion of the Property to a beekeeper for around eight to 10 years but only distributed the annual income ($300 or $350) generated by this lease to Elsie on two occasions. He explained that, "I was leasing the land, and the lease isn't restricted to what I do with the land." He later explained that he kept the money from the beekeeping operations to offset the cost of building a structure to protect the bees from his cattle, which he claimed cost $3,855. Les did not seek a legal opinion as to whether his actions with respect to the beekeeping were appropriate.

In early March 2013 Les met with Elsie and Inette to discuss the possibility of converting the Property into an almond orchard. Less than a week later, the group had a second meeting about the project. During that meeting, Les repeatedly insisted that they needed to "get going" on the project; he was "pushy" about the time frame for an

---

[6] At trial, Elsie was questioned about a previous statement in a deposition regarding later reimbursement for the hearing aids; she indicated that the deposition did not refresh her memory and she still did not remember getting reimbursed for the hearing aids at any point.

agreement. Les mentioned that he intended to find a partner for the project and that he would personally do some of the work for the project. On three occasions when Elsie tried to speak, Les "pointed his finger down" and said, "no" in a "scolding type of voice." When Inette mentioned to Elsie that it was her Property and her trust and asked her if she wanted to say something, Elsie said, "Yes, let's go to a lawyer, our attorney."

The day after the second meeting, Les and his son Paul showed up at Elsie's house unannounced to discuss the almond orchard project. During that meeting, Les spoke to Elsie in a "very cross" manner, which made her scared, very upset, and very angry. She eventually signed a document that Les presented to her so he and Paul would leave. Elsie explained that she signed the document "very reluctantly" and was very sad that she did so. Elsie could not recall the subject matter of that document when Inette asked her about it two days later. The document, which is dated March 15, 2013, indicates that Elsie agrees to lease the entire Property to Les, excluding the family home and the portion of the Property containing the cell phone tower, for 25 years at $20,000 per year.

At another meeting about a week later, Les presented Elsie and Inette a written proposal regarding the almond orchard project. The proposal provided that the Property would be leased to an entity called "WE Strojan Ranch, LLC," which was comprised of Inette, Les, Mary Anne, and Les' and Mary Anne's three children, Paul, Andy, and Kathleen. The proposed plan included Les' leasing the Property from the Family Trust at $20,000 per year for 25 years and then assigning the lease to the limited liability company, with the net income generated by the project shared by the members of the company as follows: Les and Mary Anne 35 percent, Inette 35 percent, and 10 percent for each of Les' three children. The proposal contemplated that the income would be $33,000 for the first three years and then increase to around $100,000 per year by year seven and beyond. The proposal, however, did not mention how the conversion project would be funded. During this meeting, Les aggressively and loudly pressured Inette to sign a document that he claimed was necessary for him to obtain a loan for the project.

8

When Inette indicated that she wanted professional advice about the project and walked out of the meeting without signing the document, Les "exploded" and had to be told several times by Mary Anne to quiet down.

At some point after this meeting, Elsie communicated to Les that she did not approve of his proposal for converting the Property into an almond orchard. In April 2013 Inette sent a letter to Les indicating that she was not interested in converting the Property into an almond orchard and advised him that any further communications about the project should be directed to her attorney. Around the same time, Elsie moved out of the family home and in with Inette due to Les' and Paul's harassment about the almond orchard project.

In June 2013 Les paid off the loan he had taken from the Family Trust in one lump sum payment of $52,444. Prior to paying off the loan, Les had not made regular payments for six or seven years. Les explained that he and his wife "bought" Andy's loan and that the payment of $52,444 represented the outstanding amount owed on both loans.

At trial, Inette testified that she never saw an accounting of the Family Trust. Elsie testified she could not recall a time when Les had provided her any information about the trust. She acknowledged that Les had provided her a one-page document in 2007, which summarized her projected income and expenses for that year. The projected income included the interest she would earn on certain bank accounts, interest she would earn on Les' and Inette's loans from the Family Trust, and rental income she would earn from leasing the Property to Les. The document also noted that Elsie received a distribution of $1,500 in principal from the trust and rental income from the cell tower. Elsie could not recall having any discussion with Les about the contents of this document. According to Elsie, Les gave her a similar document on one or two other occasions but otherwise did not provide her with any information about the trust.

9

Les testified that he talked with Elsie two or three times a week and that she was aware of "anything that went on in the trust" on "an ongoing basis." He claimed that he provided Elsie a statement each year of her income and expenditures for tax purposes, including the income generated by the trust and the trust's distributions. He further claimed that he discussed those statements or "worksheets" with Elsie each year, and that the worksheets he provided to her were complete and contained the same information required in a proper trust accounting. However, he admitted that the worksheets did not indicate that Elsie had received any distributions from the Family Trust, and there was no documentation as to when he and Elsie had met to discuss the worksheets.

*Filing of the Petition and Response*

In November 2013 Elsie filed a petition for relief from breach of trust pursuant to Probate Code section 16420.[7] The petition alleged that Les, as trustee of the Family Trust, breached multiple fiduciary duties owed to Elsie, the duties to: (1) deal impartially with beneficiaries in violation of section 16003; (2) avoid conflicts of interest-prohibited transactions in violation of section 16004; (3) make the trust property productive in violation of section 16007; (4) inform beneficiaries in violation of section 16060; and (5) account to beneficiaries in violation of section 16062. The alleged statutory breaches were predicated on Les' conduct in connection with the oral lease of the Property for cattle grazing, the unsecured $60,000 variable loan he took from the Family Trust, his lack of communication about the trust and its administration, and his failure to provide a complete and accurate accounting of the trust. The petition sought monetary damages and an order removing Les as the trustee, as well as an order directing Les to provide an accounting of the trust, and an order appointing Elsie as the successor trustee.

---

[7] Undesignated statutory references are to the Probate Code.

In January 2014 Les filed a response to the petition and submitted a first accounting of the Family Trust for the time period from February 15, 2001, through July 15, 2013. In his response, Les sought orders approving the first accounting and dismissing the petition on the ground that he had not breached any fiduciary duty owed to Elsie, as well as authorizing him to use funds from the trust to pay for his legal fees and the costs incurred in preparing the first accounting.

In June 2014 after Les filed an amended first accounting, the trial court issued an order approving Les' acts and transactions relating to the matters set forth in the first accounting, except as to the claims of breach of trust alleged in the petition, which were reserved for trial. Les "expressly waived" his right to seek trustee fees for the time period encompassing the first accounting.

*Settlement Attempts*

At the parties' request, the trial was continued several times for settlement purposes. In July 2015 the parties reached a settlement agreement and the material terms were stated on the record. Among other things, the parties agreed that an independent trustee would be appointed to administer the Family Trust and the survivor's trust would become irrevocable, such that Les would be entitled to half of the trust's assets at Elsie's death. The parties also agreed that Les would lease the Property from the trust pursuant to a written five-year lease for $25 per acre per year. But the agreement failed after Les learned that Elsie had executed a new will in March 2015, transferring her entire interest in the survivor's trust to Inette, thereby significantly reducing Les' interest in the trust's assets.

*Postpetition Events*

In May 2013 Les retired at age 62. At that time, he began leasing the Property to an "informal joint venture partnership" consisting of his wife (Mary Anne) and his son Paul under the terms of an oral lease. Les did not seek the advice of counsel as to whether this transaction was appropriate in light of his position as trustee. In 2015 or

11

2016, Les raised the rent on the Property to $25 per acre per year. This change in the terms of the lease was not put in writing and occurred "after the settlement conference." When Les was asked whether this litigation was his primary reason for increasing the rent, he said, "Well, not entirely. It was an appropriate adjustment, also."

When Les was asked whether Elsie had received any distribution from the Family Trust in 2015 or 2016, he indicated that she had received a $10,000 distribution on June 26, 2015, but did not otherwise receive any distribution from the trust during the time period covered by the third accounting, i.e., from May 1, 2015 to June 30, 2017. Thereafter, the trial court, over defense counsel's objection, granted Elsie's request to amend the petition to incorporate postpetition events regarding distributions from the trust. Upon further questioning, Les indicated that Elsie, at her request, had received a total of $20,000 from the trust in 2015 and $33,000 from the trust in 2014.

In September 2016 Les denied Elsie's request for a distribution from the Family Trust to pay for items that had been stolen from her residence during a break-in. Although there was a sheriff's report detailing the items that had been stolen, Les refused to distribute any funds to Elsie because she failed to provide him an itemized list and receipts for the stolen items. Les did provide Elsie with the checks issued by the insurance company for the stolen items.

In May 2017 Elsie requested a distribution from the Family Trust in the amount of $10,000. In her written request, she explained that the funds were needed for a variety of expenses, including clothes, meals, overnight trips, an extended vacation, quilting and needlework supplies, and gardening supplies for the property. At trial, Les acknowledged that he had received Elsie's request and refused to distribute money to her from the trust.

*Bench Trial and Posttrial Rulings*

In February 2017 the trial court scheduled a bench trial for August 2017. The court also ordered Les to provide an updated accounting of the Family Trust. In July

12

2017 Les filed a second and third accounting, which collectively covered the time period from July 16, 2013 to June 30, 2017.

During the three-day bench trial held in mid-August 2017, Elsie called three witnesses. Les testified first, followed by Inette, and then Elsie. Elsie turned 91 years old on the day she testified. Les was the only witness who testified for the defense.

At the close of trial, the trial court orally announced its tentative ruling. The court ruled that Les had breached his duty of trust and there were grounds for his removal as trustee. Specifically, the court found that removal was appropriate because the accountings prepared by Les prior to the commencement of this action were inadequate and constituted a breach of trust. The court explained that the accountings contained no allocation between the exemption trust and the survivor's trust, did not contain the balance of either trust, and did not satisfy the requirements of section 16063. The court further found that Les' failure to put the cattle grazing lease in writing constituted a breach of trust and justified his removal as trustee. Finally, the court found that Les' dealings with Elsie and Inette regarding the almond orchard project were also grounds for his removal as trustee. The court explained that, while Les' conduct in this regard was not a breach of trust, to the extent that he pressured Elsie and Inette to agree to the project without allowing them the opportunity to adequately investigate the proposal by consulting with lawyers or others, his conduct amounted to a conflict that justified his removal as trustee.

In August 2017 Les filed a request for a statement of decision and submitted a proposed statement of decision. Elsie objected to Les' proposed statement of decision and submitted her own proposed statement of decision, to which Les objected. In late August 2017 and, again, in October 2017, Les filed documents amending the second and third accountings and correcting the second accounting.

Following a hearing, the trial court issued a minute order in early November 2017 addressing various issues before the court. The minute order indicated that Les was

removed as trustee because he failed to account, report, and make the trust corpus productive. The court appointed Les as the temporary trustee with limitations; he was not allowed to sell, give away, or hypothecate any trust property. With minor modifications, the court approved the second and third accountings and scheduled a hearing on trustee fees, attorney fees, and the appointment of a successor trustee. Although not set forth in the minute order, the court also directed Les to prepare a proposed plan for the future handling of the trust estate to allow the court to determine whether Les should be reinstated as trustee.

In late November 2017 Les filed a motion for trustee fees and attorney fees. He sought reimbursement from the Family Trust for expenses incurred during the time period encompassing the second and third accountings. He requested trustee fees in the amount of $53,965 and attorney fees in the amount of $146,646.79. Elsie opposed the motion.

In early December 2017 the trial court issued a statement of decision that mirrored the substantive rulings set forth in its November 2017 minute order without further elaboration. It stated, in relevant part, "Trustee, Leslie D. Strojan failed to Account; failed to report and failed to make the corpus productive. Trustee, Leslie D. Strojan, is removed as Trustee. [¶] Court appoints Leslie D. Strojan as the temporary Trustee, with limitations. Trustee shall not sell, shall not give away or hypothecate property of the trust." Two days later, Les objected to the statement of decision on multiple grounds, including that the trial court's findings regarding his purported failure to account, report, and make the trust corpus productive were contrary to the evidence presented at trial. Les argued that the statement of decision did not include any findings justifying his removal as trustee. He requested the court vacate its statement of decision and issue the proposed statement of decision he had previously submitted. The court issued a corrected statement of decision the next day, which corrected typographical errors but did not alter the substance.

14

In December 2017 the trial court held a hearing on the appointment of a successor trustee, trustee fees, and attorney fees.[8] According to the resulting minute order, Les was removed as temporary trustee because his proposed plan for managing the Family Trust in the future did not satisfy the court. Also, Elsie was appointed as successor trustee and Les' request for trustee fees was denied. Finally, the minute order indicated that the trust would only be responsible for paying 25 percent of the attorney fees requested by Les, explaining that Les' counsel lacked "expertise" as he was not a probate lawyer and the duration of time counsel spent on this matter was "too long and had no point." The court directed Elsie's counsel to prepare a formal order and submit it to the court for approval.

At the hearing on these matters, the trial court stated that it had already "made findings of breach of fiduciary duties and self-dealing, that the 'amount of the lease' was not arms-length, and there were no competitive bids and no alternative to land lease pursued," and that "self-dealing alone [was] grounds for removal and sanctions."[9] The court further stated that Les had failed to make the trust productive and failed to treat the beneficiaries equally and fairly, as he did not provide sufficient income for Elsie. The court noted that Les was "myopic in his efforts at preserving the land for contingent beneficiaries to the detriment of the life beneficiary." The court explained that the trust required Les to make distributions to Elsie consistent with the standard of living to which she was accustomed when Walter was alive, and that while Walter provided an income to himself and Elsie when he was alive, that income was transferred to Les and his son after Walter died, to the detriment of Elsie. The court noted that there were four years during

---

[8] There was no court reporter at this hearing. After the hearing, the court approved, as modified, the settled statement prepared by the defense.

[9] It is not clear from the record when these findings were made by the trial court. A court reporter was not present at the early November 2017 hearing, and there is no settled statement of that hearing in the record.

15

which Elsie received an average monthly income of $750, which is below the federal poverty line.

In denying Les' request for trustee fees, the trial court explained that Les' attempts to "account" during his tenure as trustee were inadequate and that he only prepared proper accountings after this action was filed. Les' counsel was not an experienced probate attorney, who "would have understood and counseled [Les] to resolve the problems and not litigate against them." The court described as "star[t]ling" Les' failure to put the lease in writing, his failure to provide income to Elsie, and his "hyper focus" on the preservation of the Property at the expense and detriment of Elsie. The court found that Les' defense of his actions as trustee amounted to statutory bad faith.[10] As for attorney fees, the court concluded that a 75 percent reduction in fee request was appropriate. In reaching this conclusion, the court found that Les' counsel had over-litigated this action, as an experienced probate attorney would not have prolonged the litigation as Les' counsel had done, and that Les and his attorney were "completely at fault" for the years of litigation.

In January 2018 the trial court issued a judgment after court trial. The judgment held that Les had breached his fiduciary duties as trustee in four ways, any one of which

---

[10] In discussing attorney fees, the trial court commented that a trustee's bad faith defense "makes the trustee personally liable" but indicated that this issue would have to be addressed by way of a motion filed by Elsie. In making this comment, the court referenced section 17211, subdivision (b), which provides: "If a beneficiary contests the trustee's account and the court determines that the trustee's opposition to the contest was without reasonable cause and in bad faith, the court may award the contestant the costs of the contestant and other expenses and costs of litigation, including attorney fees, incurred to contest the account. The amount awarded shall be a charge against the compensation or other interest of the trustee in the trust. The trustee shall be personally liable and on the bond, if any, for any amount that remains unsatisfied." A review of the record reveals that Elsie never filed a motion seeking expenses and costs of litigation pursuant to section 17211, subdivision (b).

16

provided a sufficient basis for his removal as trustee. First, the court ruled that Les engaged in self-dealing in violation of section 16004 (conflicts of interest) by leasing the Property to himself pursuant to an oral lease, which was not an arm's length transaction and not an enforceable agreement. The court found that Les did not consider any comparable properties in setting the terms of the oral lease and did not consider any other use of the Property. Second, the court ruled that Les had failed to make the trust productive in violation of section 16007 (productivity of trust property)[11] by failing to increase income to the trust through means that would have increased the income distributable to Elsie. In so ruling, the court observed that the average monthly distributions to Elsie fell below the federal poverty line while the dramatically increased value of the real property was a benefit to Les and other remainder beneficiaries. Third, the court ruled that Les had failed to treat all beneficiaries impartially in violation of section 16003 (multiple beneficiaries; impartiality) by failing to treat Elsie, the lifetime beneficiary, with the required statutory level of equableness to himself and other residual beneficiaries. In making this ruling, the court characterized the actions of Les as "myopic" with respect to the preservation of the Property. Fourth, the court ruled that Les failed to communicate and account as required under sections 16060 (duty to inform) and 16062 (duty to account). The court noted that Les only prepared proper accountings and schedules of the trust's assets after this action was filed.

In view of the foregoing breaches of trust, the trial court denied Les' request for trustee fees. As for attorney fees, the court concluded that a 75 percent reduction in the fee request was proper. The court found the amount of fees requested excessive because Les' counsel had failed to apply and analyze the claims made by Elsie and Les' conduct under the appropriate law. The actions of Les' counsel were excessive, and Les'

[11] We note that the judgment erroneously states that Les failed to make the trust productive in violation of section 16003 rather than section 16007.

17

opposition to the petition was in bad faith. Finally, with respect to the plan the trial court had ordered Les to prepare in order to assess his possible reinstatement as trustee, the court found it inadequate and that it failed to provide sufficient detail and proposed actions to remedy Les' prior failures as trustee. The court removed Les as trustee and appointed Elsie as the successor trustee.

In February 2018 Les timely appealed from the judgment after court trial.

In August 2018 the trial court granted Elsie's request to be appointed temporary trustee of the Family Trust during the pendency of Les' appeal. The court's order appointed Elsie as temporary trustee "with all fiduciary powers and rights, excluding the power to transfer real property of the subject trust" during the pendency of Les' appeal. The order directed Elsie to post a $150,000 bond and to provide Les copies of all monthly bank statements related to the Family Trust. In October 2018 Les timely appealed from this order. We consolidated the appeals for oral argument and disposition.

## DISCUSSION

### I

### *Scope of Appellate Review*

It is undisputed that Les properly and timely appealed from the trial court's judgment after court trial and postjudgment order appointing Elsie as temporary trustee. However, the parties disagree about what other, earlier rulings this court may review. Les purports to appeal from various prejudgment minute orders, the statement of decision, and the corrected statement of decision. As relevant here, these documents collectively involve rulings related to the merits of the petition as well as Les' request for trustee fees and attorney fees.

We conclude that the minute orders and the statements of decision are not separately appealable because the trial court's judgment after court trial is the final order of the court containing its findings of fact and conclusions of law with respect to the petition, the request for trustee fees, and the request for attorney fees. A judgment

18

supersedes any memorandum decision or tentative ruling issued before entry of judgment. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 268 [a trial court retains inherent authority to change its decision, its findings of fact, or its conclusions of law at any time before entry of judgment].)[12] A statement of decision or minute order is not treated as appealable when, as here, a formal order or judgment follows. (*Alan v. American Honda Motor Co., Inc.* (2007) 40 Cal.4th 894, 901; see *Estate of Sapp* (2019) 36 Cal.App.5th 86, 99 [a tentative decision is not an appealable judgment or order].) Accordingly, these consolidated appeals are limited to the trial court's judgment after court trial and the trial court's postjudgment order appointing Elsie as temporary trustee during the pendency of Les' appeal from the judgment.

## II

### *Removal of Les as Trustee*

Les contends that reversal is required because the trial court erred in removing him as trustee of the Family Trust. We disagree.

A. *Generally Applicable Legal Principles and Standard of Review*

"A trustee may be removed . . . on petition of a settlor . . . or beneficiary under Section 17200." (§ 15642, subd. (a).) A trustee's breach of trust is grounds for removal as trustee. (§ 15642, subd. (b)(1); § 16420, subd. (a)(5).)

"A violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust." (§ 16400.) Trustees owe all beneficiaries a variety of fiduciary duties. As a fiduciary, a trustee must act with utmost good faith on behalf of and for the benefit of the trust beneficiaries. (*Hearst v. Ganzi* (2006) 145 Cal.App.4th 1195, 1208.) As relevant here, the fiduciary duties of a trustee include the duty to deal impartially with all

---

[12] For this reason, we reject Les' contention that reversal is required due to the trial court's purported inconsistent rulings in its oral tentative ruling, minute orders, statement of decision, and judgment.

beneficiaries (§ 16003); the duty to avoid conflicts of interest (§ 16004); the duty to make trust property productive (§ 16007); the duty to keep the beneficiaries of the trust reasonably informed of the trust and its administration (§ 16060); and the duty to account, at least annually, to each beneficiary to whom income or principal is required or authorized in the trustee's discretion to be currently distributed (§ 16062).  " 'Any violation of such duties constitutes a fraud against the beneficiaries.  [Citations.]  [¶] Moreover, a trustee is subject to removal whenever his private interests conflict with his trust duties.' "  (*Estate of Cairns* (2010) 188 Cal.App.4th 937, 949.)

We review a trial court's decision to remove a trustee for abuse of discretion. (*Estate of Gilmaker* (1962) 57 Cal.2d 627, 633; *Trolan v. Trolan* (2019) 31 Cal.App.5th 939, 957.)  " 'An abuse of discretion occurs only if the reviewing court, considering the applicable law and all of the relevant circumstances, concludes that the trial court's decision exceeds the bounds of reason and results in a miscarriage of justice.' [Citations.]  In applying the abuse of discretion standard, 'we resolve all evidentiary conflicts in favor of the judgment and determine whether the court's decision " 'falls within the permissible range of options set by the legal criteria.' " '  [Citation.]  We may reverse only if the trial court's decision ' "exceeds the bounds of reason, all of the circumstances before it being considered." ' "  (*Orange Catholic Foundation v. Arvizu* (2018) 28 Cal.App.5th 283, 292-293.)

As with all factual determinations, we review the trial court's finding of a breach of fiduciary duty under the substantial evidence standard.  (*Orange Catholic Foundation v. Arvizu, supra,* 28 Cal.App.5th at p. 292 ["We review the trial court's findings of fact [in determining whether trustee breached duties], including its factual findings on witness credibility and whether [the trustee] acted reasonably and in good faith, under the substantial evidence standard of review"]; *Williamson v. Brooks* (2017) 7 Cal.App.5th 1294, 1299 [reviewing findings of fact that cotrustees did not breach fiduciary duties for substantial evidence].)  "Under that standard, our review begins and

20

ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, to support the findings below. [Citations.] In assessing whether any substantial evidence exists, we view the record in the light most favorable to respondents, giving them the benefit of every reasonable inference and resolving all conflicts in their favor. [Citation.] '[I]t is not our role to reweigh the evidence, redetermine the credibility of witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it.' " (*Williamson*, at pp. 1299-1300.) "Moreover, findings of fact are liberally construed to support the judgment." (*Estate of Young* (2008) 160 Cal.App.4th 62, 76.) We " ' " 'must *presume* that the record contains evidence to support every finding of fact,' " ' " and " '[i]t is the appellant's burden . . . to identify and establish deficiencies in the evidence.' " (*Holguin v. DISH Network LLC* (2014) 229 Cal.App.4th 1310, 1326.) The appellant must set forth all the material evidence, both " 'favorable and unfavorable, and show how and why it is insufficient.' " (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409, italics omitted.) Failure to do so forfeits on appeal the challenge to the sufficiency of the evidence. (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.)

      B. *Analysis*

      As an initial matter, we conclude that Les has forfeited his sufficiency of the evidence challenge to the trial court's breach of fiduciary duty findings because he failed to set forth all the material evidence, favorable and unfavorable, and explain how and why it is insufficient to support the court's findings. Instead, he merely recites evidence, often without proper record citations, that he perceives as supportive of his position. He also complains that the trial court ignored Elsie's credibility issues and ignored the "collusion" between Inette and Elsie.

      Les misconceives our role. Even assuming substantial evidence supports his position, this support does not signal error. We do not reweigh the evidence, redetermine the credibility of witnesses, or resolve conflicts in the testimony. (*Williamson v. Brooks,*

*supra,* 7 Cal.App.5th at p. 1300.)  Nor do we determine whether substantial evidence supports Les' factual assertions.  To the contrary, under the deferential substantial evidence standard of review, "findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings."  (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)  "The trial court sits as trier of fact and it is called upon to determine that a witness it to be believed or not believed.  That is the nature of factfinding.  'The trier of fact is the sole judge of the credibility and weight of the evidence . . . .' "  (*In re Marriage of Greenberg* (2011) 194 Cal.App.4th 1095, 1099.)  The testimony of one witness may constitute substantial evidence to support a finding.  (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613.)

In any event, we conclude the record contains substantial evidence to support the trial court's breach of fiduciary duty findings.  Viewing the record in the light most favorable to the judgment, there is sufficient evidence to support the court's conclusion that Les failed to keep Elsie reasonably informed about the trust and its administration (§ 16060), and failed to prepare proper accountings of the trust (§§ 16062, 16063).  Elsie testified that Les never talked to her about the terms of his oral lease of the Property or the terms of the unsecured $60,000 loan he took from the trust.  She could not recall a time when he provided her information about the trust, and the papers he purportedly gave to her every year summarizing her income and expenses do not satisfy the statutory accounting requirements set forth in the Probate Code.  (§ 16063.)[13]  Les provided Elsie

---

[13] An account furnished under section 16062 must contain the following information: "(1) A statement of receipts and disbursements of principal and income that have occurred during the last complete fiscal year of the trust or since the last account.  [¶]  (2) A statement of the assets and liabilities of the trust as of the end of the last complete fiscal year of the trust or as of the end of the period covered by the account.  [¶]  (3) The trustee's compensation for the last complete fiscal year of the trust or since the last account.  [¶]  (4) The agents hired by the trustee, their relationship to the trustee, if any,

with only a one-page summary document on two or three occasions, and she could not recall having a conversation with him about these summaries. This testimony is sufficient evidence to support the challenged findings of breach.

Sufficient evidence also supports the trial court's findings that Les failed to deal impartially with all beneficiaries in his management of the trust property (§ 16003), avoid conflicts of interest (§ 16004), and make the trust property productive (§ 16007). "As a fiduciary, the trustee ' "is bound to act in the highest good faith toward his beneficiary and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind." ' [Citation.] Where there are two or more beneficiaries, the duty of impartiality, memorialized in section 16003, provides, '[T]he trustee has a duty to deal impartially with them and shall act impartially in investing and managing the trust property, taking into account any differing interests of the beneficiaries.' " (*Trolan v. Trolan*, *supra*, 31 Cal.App.5th at p. 959.) Additionally, "[t]he trustee has a duty not to use or deal with trust property for the trustee's own profit or for any other purpose unconnected with the trust, nor to take part in any transaction in which the trustee has an interest adverse to the beneficiary." (§ 16004, subd. (a).) "A transaction between the trustee and a beneficiary which occurs during the existence of the trust . . . by which the trustee obtains an advantage from the beneficiary is presumed to be a violation of the trustee's fiduciary duties. This presumption is a presumption affecting the burden of proof." (§ 16004, subd. (c).) Finally, "[a] trustee must preserve trust property and make it productive. [Citations.] . . . In discharging these duties, a trustee must use 'reasonable care, skill, and caution'

---

and their compensation, for the last complete fiscal year of the trust or since the last account. [¶] (5) A statement that the recipient of the account may petition the court pursuant to Section 17200 to obtain a court review of the account and of the acts of the trustee. [¶] (6) A statement that claims against the trustee for breach of trust may not be made after the expiration of three years from the date the beneficiary receives an account or report disclosing facts giving rise to the claim." (§ 16063, subd. (a).)

23

[citation] and 'invest and manage trust assets as a prudent investor would . . . .' [Citation.] In brief, the trustee's fundamental duty is to use due care to protect the trust property." (*Moeller v. Superior Court* (1997) 16 Cal.4th 1124, 1132; see § 16040.)

The evidence showed that Les orally leased the primary asset of the trust estate to himself for more than 12 years after the (2001) trust was created at a rate of $20 per acre per year. This rate was far below the 1979 rate of $32.50 per acre per year. Meanwhile, Les distributed an average of only $6,000 per year from the Family Trust to Elsie from 2009 to 2013. As we have described in detail above, Les denied Elsie's request for a distribution from the trust to pay for various items, including items that had been stolen from her home in 2016, and failed to distribute *any* funds to Elsie from the trust over a two year period from late June 2015 to late June 2017, despite her request for a $10,000 distribution in May 2017.[14] Les offered no evidence at trial corroborating his suggestion

---

[14] Les contends the trial court erred to the extent it removed him as trustee based on inadequate trust distributions to Elsie, since the petition contained no such allegations. As an initial matter, Les has forfeited this issue by failing to provide legal argument with citation to authority. (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) In any event, we see no error. Initially, Les' claim related to pre-petition distributions is not preserved for review as he failed to object in the trial court on the ground the evidence was outside the issues framed by the petition. (*People v. Maury* (2003) 30 Cal.4th 342, 427; *Petaluma Bldg. Materials, Inc. v. Foremost Properties, Inc.* (1960) 180 Cal.App.2d 83, 86.) As for postpetition distributions, the court (over defense objection) granted Elsie's request (made at trial) to amend the petition to incorporate postpetition facts regarding trust distributions. In doing so, the court found that Les would suffer no prejudice by the amendment. A trial court may allow a party to amend any pleading "at any stage of the proceedings, up to and including trial," in the absence of prejudice to the other party. (*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 761; Code Civ. Proc., § 473, subd. (a).) "It is of course settled that the allowance of amendments to conform to the proof rests largely in the discretion of the trial court and its determination will not be disturbed on appeal unless it clearly appears that such discretion has been abused." (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31.) We discern no abuse of discretion. As trustee, Les was required to provide an accounting of the distributions from the trust. Therefore, we are unpersuaded by his conclusory assertion that he was prejudiced by the

that the annual rent he paid for leasing the Property during the relevant time period--unchanged since 1980--was a fair market rate. After the petition was filed, in 2015 or 2016, Les raised the rent as "an appropriate adjustment." However, he presented no evidence of comparable properties or other evidence showing that the annual rent he paid to Elsie was fair and reasonable.

The record also shows that Les violated the terms of the trust instrument by taking an *unsecured* $60,000 variable loan from the trust in 2003 without telling Elsie. The terms of the loan, which Les never discussed with Elsie, did not include a payment schedule or any indication as to how interest was to be calculated, and Les did not consistently make payments on the loan for six or seven years before paying it off in one lump sum payment in June 2013, approximately six months before this action was commenced and approximately two months after Elsie moved out of the family home due to Les' harassment about his almond orchard proposal. Finally, there was evidence that, in March 2013, Les pressured Elsie, who was in her late 80s at the time, to agree to convert the Property into an almond orchard under a proposed plan that would pay her $20,000 per year but collectively pay other members of her family, including Les and his immediate family members, far more by way of income generated by the project.

Although Les argues that removal should be reserved for "egregious cases" under "extreme grounds," he relies on language from cases that are inapposite. For example, in *Copley v. Copley* (1981) 126 Cal.App.3d 248, on which counsel for Les primarily relied at oral argument, the husband/settlor had appointed his wife as both cotrustee and administratrix; much litigation ensued after his death, and as relevant here the trial court removed the wife as trustee. (*Id.* at pp. 256-259.) In reversing the removal, the appellate court analyzed the intent of the deceased settlor, noting that the court's duty was to carry

---

allowance of the amendments because he was unprepared to litigate the issue of his postpetition distributions.

out the settlor's intent, and that clearly he had intended the appointment of his wife to encompass two possibly conflicting roles. (*Id*. at pp. 270-272.) Regarding her removal itself, the appellate court considered only the propriety of removal on the (remaining) grounds of hostility, antagonism, and future conflict and unwillingness to supply information related to the administration of one of the two trusts without court order. (*Id*. at p. 286.) In holding these grounds insufficient to justify the wife's removal as trustee, the court referenced older cases (all also cited by appellant in his briefing) where future conflict was alleged and the decedent settlor was aware of the conflict at the time of the challenged appointment.

This is not at all the situation in this case. This is not a situation where a possible future conflict and interfamilial squabbling is alleged. Here, the remaining living settlor and life beneficiary alleged statutory breaches of duty by the current trustee and sought his removal. The settlor's intent is not at issue, and the alleged mismanagement of the trust is not a future hypothetical situation. This case is not even analogous to the line of cases on which appellant relies in arguing the need for a heightened showing.

On this record, we cannot conclude that Les has carried his burden to show that the trial court abused its discretion in removing Les as trustee.

III

*Affirmative Defenses*

Les contends the trial court erred by failing to rule in his favor on his affirmative defenses of consent, affirmation, laches, equitable estoppel, and waiver. He claims any claim of breach of trust predicated on his oral lease of the Property and the unsecured $60,000 loan is barred by these defenses. We find no error.

A. *Generally Applicable Legal Principles*

A fundamental rule of appellate review is that " '[a] judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively

26

shown.  This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)  "In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.  Rather than scour the record unguided, we may decide that the appellant has waived a point urged on appeal when it is not supported by accurate citations to the record. [Citations.] Similarly, we may disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt." (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286-287.)

Additionally, under the doctrine of implied findings, the appellate court must infer that the trial court made all factual findings necessary to support the judgment.  (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133-1134.)  To avoid application of the doctrine, a party must request a statement of decision, and if one is issued, the party must timely bring any omissions or ambiguities in the statement of decision to the trial court's attention so that the trial court has an opportunity to correct them.  (*Ibid*.)  "[I]f a party does not bring such deficiencies to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient in these regards, and hence the appellate court will imply findings to support the judgment." (*Ibid*.; *Fladeboe v. American Isuzu Motors, Inc*. (2007) 150 Cal.App.4th 42, 58-60.)  The question then becomes whether substantial evidence supports the implied factual findings.  (*Fladeboe*, at p. 60.)

To bring defects in a statement of decision to the trial court's attention, objections to a statement of decision must be "specific." (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 498.)  "The alleged omission or ambiguity must be identified with sufficient particularity to allow the trial court to correct the defect. [Citation.]  'By filing specific objections to the court's statement of decision a party pinpoints alleged

27

deficiencies in the statement and allows the court to focus on the facts or issues the party contends were not resolved or whose resolution is ambiguous.' " (*Ibid*.)

Although Les presented the issue of his affirmative defenses to the trial court for consideration in his trial brief, in closing argument, and in his request for a statement of decision following the trial court's tentative decision, he did not specifically object to the statement of decision on the ground that it failed to address his affirmative defenses. Instead, he generally complained that the statement of decision did not "resolve controverted issues, contains omissions, and is ambiguous." He then went on to object to the statement of decision on numerous specific grounds, none of which involved the failure to rule on his affirmative defenses. Further, Les did not object to the judgment issued after court trial, which, unlike the brief statement of decision, provided detailed reasons why Les was removed as trustee and also failed to address his affirmative defenses. Under these circumstances, we conclude that the doctrine of implied findings applies. We will therefore imply any factual findings necessary to support the conclusion that Les' affirmative defenses do not apply.

B. *Analysis*

We conclude Les has forfeited any claim that the trial court erred in failing to rule in his favor on his affirmative defenses. His legal arguments, which span a mere four pages of his 91-page opening brief, are conclusory and not supported by meaningful legal analysis and citations to evidence in the record.[15] As a consequence, we disregard them. (*City of Santa Maria v. Adam, supra,* 211 Cal.App.4th at pp. 286-287.) Moreover, Les

---

[15] "Each and every statement in a brief regarding matters that are in the record on appeal, whether factual or procedural, must be supported by a citation to the record. This rule applies regardless of where the reference occurs in the brief." (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 97, fn. 2.) "It is not the duty of a reviewing court to search the record for evidence on a point raised by a party whose brief makes no reference to the pages where the evidence can be found." (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1011.)

failed to undertake the proper substantial evidence analysis regarding the implied factual findings necessary to support the conclusion that the affirmative defenses do not apply. Instead, he only mentions evidence he believes supports a finding that the defenses apply. Accordingly, he has forfeited consideration of this issue on appeal. (*Baxter Healthcare Corp. v. Denton* (2004) 120 Cal.App.4th 333, 368 ["If the appellant fails to set forth all of the material evidence, its claim of insufficiency of the evidence is waived"].)

IV

*Failure to Exclude Inette From the Courtroom*

Prior to trial, Les filed a motion seeking to exclude Inette from the courtroom when she was not testifying under Evidence Code section 777. In denying the motion, the trial court found that Inette was an interested party as a beneficiary under the terms of the Family Trust. On appeal, Les contends the court prejudicially erred in denying his motion. He argues exclusion of Inette was warranted because she exerted undue influence over Elsie.

Evidence Code section 777 provides that "the court may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses," but also provides that "[a] party to the action cannot be excluded under this section." (*Id.*, subds. (a) & (b).) "The purpose of [a witness exclusion] order is to prevent tailored testimony and aid in the detection of less than candid testimony." (*People v. Valdez* (1986) 177 Cal.App.3d 680, 687.) We review a ruling on a motion to exclude witnesses for abuse of discretion. (*People v. Tully* (2012) 54 Cal.4th 952, 1004.)

We find no error. At the time the Family Trust was created in 2001, Inette was a contingent beneficiary of a revocable trust. However, when Walter died in 2002, her interest in the trust vested. Under the terms of the trust, at the first settlor's death, the trustee must divide the trust into an irrevocable exemption trust and a revocable survivor's trust. Thus, at the time of trial in 2017, Inette qualified as an "interested

29

person" within the meaning of the Probate Code and had standing to participate in the proceeding. (See § 48, subd. (a)(1); *Estate of Giraldin* (2012) 55 Cal.4th 1058, 1062 [when a settlor dies and a trust becomes irrevocable, the beneficiaries' interest in the trust vests and they have standing to sue for breach of fiduciary duty, including for breaches that occurred during the period when the trust was revocable]; *Estate of Sobol* (2014) 225 Cal.App.4th 771, 782 [a beneficiary with " 'a property right in or claim against a trust estate . . . which may be affected by the proceeding,' " has standing to participate in the probate proceedings].) Accordingly, we discern no abuse of discretion in the trial court's denial of Les' motion to exclude Inette from the courtroom. (See *Chester v. Bower* (1880) 55 Cal. 46, 48 [no error in excepting party in interest, though not a party of record, from ruling excluding witnesses from the courtroom].)

Even if we assume the trial court abused its discretion, Les has failed to establish prejudice. A judgment may not be reversed on appeal unless, after an examination of the entire cause, including the evidence, it appears that the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.) A "miscarriage of justice" may be found on appeal " ' "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069.) Prejudice is not presumed (Code Civ. Proc., § 475), and the appellant bears the burden of establishing prejudice by explaining specifically how the error caused a miscarriage of justice, i.e., how it is reasonably probable that, but for the error, the appellant would have obtained a more favorable result (*Holmes v. Petrovich Development Co., LLC* (2011) 191 Cal.App.4th 1047, 1073). Here, Les has not shown that the failure to exclude Inette from the courtroom resulted in a miscarriage of justice. He argues that he was prejudiced because Inette's presence in the courtroom during his testimony allowed her to tailor her testimony regarding the almond orchard project. However, at most, Les' conduct in this regard was one of several

30

independent grounds identified by the trial court for removing him as trustee. The court's oral tentative ruling specifically identified this conduct as a basis for removal but the judgment after court trial does not. Even if we assume the conduct was a basis for removal, Les has failed to establish that, absent the alleged error, the trial court would not have removed him as trustee.

V

*Trustee Fees and Attorney fees*

Les next contends the trial court erred in denying his request for trustee fees and reducing his request for attorney fees by 75 percent. We disagree.

A. *Applicable Legal Principles*

"[T]he Probate Code is studded with provisions authorizing the trustee to hire and pay (or seek reimbursement for having paid) attorneys to assist in trust administration." (*Hollaway v. Edwards* (1998) 68 Cal.App.4th 94, 97.) For example, section 16247 empowers the trustee "to hire . . . attorneys . . . to advise or assist the trustee in the performance of administrative duties." Section 16243 provides: "The trustee has the power to pay . . . reasonable compensation . . . of . . . agents of the trust . . . incurred in the . . . administration . . . and protection of the trust." Section 15684 provides: "A trustee is entitled to the repayment out of the trust property for the following: [¶] (a) Expenditures that were properly incurred in the administration of the trust. [¶] (b) To the extent that they benefited the trust, expenditures that were not properly incurred in the administration of the trust."

"Compensation may be reduced or denied where the trustee acts . . . in breach of the trust." (*Estate of Gump* (1991) 1 Cal.App.4th 582, 597 & fn. 16.) Indeed, the statutory remedies available to a beneficiary for a trustee's breach of trust include a reduction or denial of the trustee's compensation. (§ 16420, subd. (a)(7); *Estate of Gump*, at p. 598.) In deciding to reduce or deny compensation to a trustee who has committed a breach of trust, a trial court may consider the following factors: "(1)

31

whether the trustee acted in good faith or not; (2) whether the breach of trust was intentional or negligent or without fault; (3) whether the breach of trust related to the management of the whole trust or related only to a part of the trust property; (4) whether or not the breach of trust occasioned any loss and whether if there has been a loss it has been made good by the trustee; (5) whether the trustee's services were of value to the trust." (Rest.2d Trusts, § 243.)

" 'If litigation is necessary for the preservation of the trust, the trustee is entitled to reimbursement for his or her expenditures from the trust; however, if the litigation is specifically for the benefit of the trustee, the trustee must bear his or her own costs incurred, and is not entitled to reimbursement from the trust.' " (*Donahue v. Donahue* (2010) 182 Cal.App.4th 259, 270.) " 'The underlying principle which guides the court in allowing costs and attorneys' fees incidental to litigation out of a trust estate is that such litigation is a benefit and a service to the trust.' [Citation.] Consequently, where the trust is not benefited by litigation, or did not stand to be benefited if the trustee had succeeded, there is no basis for the recovery of expenses out of the trust assets." (*Whittlesey v. Aiello* (2002) 104 Cal.App.4th 1221, 1230.) For example, "litigation seeking to remove or surcharge a trustee for mismanagement of trust assets would not warrant the trustee to hire counsel at the expense of the trust. Such litigation would be for the benefit of the trustee, not the trust." (*Id*. at p. 1227; see *Estate of Gump*, *supra*, 1 Cal.App.4th at p. 605 ["[a] trustee is not entitled to attorney fees and expenses of litigation where it is determined that the trustee breached the trust, unless . . . the trustee's actions resulted in a benefit to the trust"].)

The determination regarding compensation for trustee services and litigation expenses "rests in the sound discretion of the trial court, whose ruling will not be disturbed on appeal in absence of a manifest showing of abuse." (*Estate of McLaughlin* (1954) 43 Cal.2d 462, 465; *Whittlesey v. Aiello, supra*, 104 Cal.App.4th at p. 1230.) "In reviewing for an alleged abuse of discretion, we cannot substitute our opinion and

thereby divest the superior court of its discretionary power, but rather we must determine whether the trial court exceeded ' "the bounds of reason, all of the circumstances before it being considered . . . ." ' " (*Smith v. Krueger* (1983) 150 Cal.App.3d 752, 757.) "An abuse of discretion may be found only if ' "no judge could have reasonably reached the challenged result." ' " (*O'Donoghue v. Superior Court* (2013) 219 Cal.App.4th 245, 269.) "It is the [trial] court's province on the basis of the records and facts before it to determine what fees are proper. In making this determination the court may consider what were necessary expenses, the value thereof to the estate, and the value, amount and kind of assets in the estate. [Citations.] Unless otherwise shown, it will be presumed that the probate court considered and fairly weighed all of the relevant factors." (*Estate of Turino* (1970) 8 Cal.App.3d 642, 649.) We review any factual findings made in connection with an award of attorney fees under the substantial evidence standard. (*In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 291.)

       B. *Analysis*

       We find no abuse of discretion in the trial court's decision to deny Les trustee fees.[16] Likewise, we find no abuse of discretion in the trial court's decision to reduce the request for attorney fees by 75 percent.

---

[16] Les correctly points out that the terms of the Family Trust authorized him to defend against the petition. The relevant section of the trust instrument, titled "Power to Initiate or Defend Litigation and to Compromise," provides that the trustee has the power "[t]o initiate or defend, at the expense of the trust, any litigation relating to the trust or any property of the trust estate the trustee considers advisable, and to compromise or otherwise adjust any claims or litigation against or in favor of the trust." Les does not claim that this provision imposed a duty on him to defend against the petition or authorizes payment of attorney fees from the trust more expansive than the Probate Code and case authority. (See *People ex rel. Harris v. Shine* (2017) 16 Cal.App.5th 524, 536 [trust instrument included express indemnity provisions more expansive than the Probate Code and case authority, limiting trustee's liability for all claims and expenses emanating from the administration of the trust, including attorney fees, unless the trustee engaged in "willful misconduct or gross negligence"].)

As we have explained, substantial evidence supports the trial court's conclusion that Les breached multiple fiduciary duties owed to Elsie in administering the Family Trust, including his duty to account. Les, in his actions as trustee, caused the present controversy and the litigation did not benefit the trust. As set forth *ante*, in denying trustee fees and disallowing most of the requested attorney fees, the trial court identified multiple concerning problems with Les' administration of the trust and found that Les' actions in defending against the petition amounted to statutory bad faith. The court noted that Les' counsel was not an experienced probate attorney but instead was a litigator who had "over-litigated" this case. The court found Les and his counsel were "completely at fault" for the years of litigation. Finally, the court found that Les' counsel's actions in the litigation were excessive, as was the attorney fees request, as counsel had failed to apply and analyze the legal claims made by Elsie and the conduct of Les under the appropriate legal authority.

Les has not shown that the factual findings made by the trial court are unsupported by substantial evidence or otherwise shown that the court abused its discretion in denying trustee fees and reducing attorney fees. His claim of error fails.

VI

*Appointment of Elsie as Temporary Trustee*

Les contends the trial court erred by appointing Elsie as the temporary trustee during the pendency of his appeal from the judgment. According to Les, reversal is required because: Elsie failed to show extraordinary circumstances to justify her appointment as temporary trustee; Elsie is incompetent to serve as trustee; and Elsie engaged in disqualifying misconduct. We find no error.

A. *Additional Background*

After Les appealed the judgment, Elsie filed an ex parte motion for appointment of temporary trustee pending appeal pursuant to section 1310, subdivision (b). In her motion, Elsie noted that Les, along with his wife and son, were currently leasing the

34

Property, and argued that her appointment as temporary trustee was necessary to prevent Les from engaging in the same conduct that led to his removal as trustee, including using the Property for his own personal benefit while failing to provide her with sufficient income from the trust.

Les filed a written opposition, arguing that Elsie's motion should be denied because she had failed to meet her burden to show extraordinary circumstances to justify her appointment as temporary trustee, and because she was unqualified to act as trustee due to her age, lack of experience, and memory problems. He also argued that Elsie's motion should be denied because she had engaged in improper conduct after the judgment was issued. Les asserted that Elsie took multiple significant legal actions as trustee when she was not, in fact, the trustee, including "draining" all the trust's bank accounts, filing a document with the county Recorder's office stating she is the trustee, improperly conveying "the marital exemption subtrust's . . . interest in the [property] to the Survivor[']s trust . . . *for no consideration*," and issuing an invalid eviction notice to filed an unlawful detainer action in an effort to "kick him off the [property]."

Elsie filed a supplemental declaration in response to Les' opposition, wherein she explained that she had merely closed the existing accounts and opened new accounts at a different bank, which resulted in a small penalty for the closure of one of the accounts. She explained that she had conveyed "the portion of the real property that had been incorrectly allocated to the Martial [*sic*] Trust by [Les] . . . to correct this error." Elsie acknowledged that she was 91 years old but stated that she had "not been diagnosed with anything . . . that would make [her] incompetent to act as Trustee of th[e] Trust." Finally, Elsie noted that in May 2017, Les had denied her request for a $10,000 distribution from the trust to pay for items including clothes and garden supplies for the property.

In July 2018 the trial court held an unreported hearing on this matter. After hearing argument, the court granted Elsie's motion and ordered her to post a $150,000

35

bond. The court's ruling gave Elsie, as temporary trustee, all fiduciary powers and rights of a trustee, except the power to transfer the Property during the pendency of Les' appeal. The court directed Elsie to provide Les copies of all bank statements related to funds in the trust on a monthly basis. Neither the minute order nor the order after hearing disclose the court's reasoning in granting the motion. The record does not contain a settled statement of the hearing.

B. *Applicable Legal Principles*

Section 1300, subdivision (g) provides that a party may appeal from an order removing a fiduciary. Generally, an appeal challenging the removal of a fiduciary under section 1300 stays the operation and effect of the removal order. (§ 1310, subd. (a).) However, section 1310, subdivision (b) provides an exception to the stay rule. It states, in pertinent part: "Notwithstanding that an appeal is taken from the judgment or order, for the purpose of preventing injury or loss to a person or property, the trial court may direct the exercise of the powers of the fiduciary, or may appoint a . . . temporary trustee, to exercise the powers, from time to time, as if no appeal were pending."

In a case involving a predecessor to section 1310, subdivision (b), our Supreme Court held that "[b]y specifically conditioning the application of the statute upon the prevention of injury or loss to person or property the Legislature has determined that the exception should be operative only in a limited class of cases. This language, with its emphasis upon preventative action, imports a sense of urgency. While such situations are not inconceivable, the necessity for immediate action to avert such potential injury or loss is not a common circumstance in the usual conservatorship proceeding. Thus, on its face, the language of the statute indicates (1) that the only instances properly falling within the ambit of the exception are those which present a necessity for preventive action against the particular risk contemplated by the statute; and (2) that such instances are probably rare. In sum, the language of this statute strongly suggests that the exception applies only

36

to the exceptional case involving a risk of imminent injury or loss." (*Gold v. Superior Court* (1970) 3 Cal.3d 275, 281.)

Section 1310, subdivision (b) "should be narrowly construed to apply only to the exceptional case in which imminent injury or loss to a person or property is clear. Monetary loss may satisfy this standard. [Citation.]  The Legislature recognized that 'some situations present such an extraordinary risk of injury or loss that they require immediate intervention by the probate court to make orders which can be implemented immediately despite the filing of an appeal, and regardless of the result on appeal.' [Citation.]  Nevertheless, the application of section 1310(b) 'must be clearly justified by a showing of risk of imminent injury or loss.' " (*Sterling v. Sterling* (2015) 242 Cal.App.4th 185, 199.)

C. *Analysis*

We have described *ante* the fundamental rule of appellate review that an order of a lower court is presumed correct and error must be affirmatively shown.  (*Denham v. Superior Court, supra*, 2 Cal.3d at p. 564.)  " 'In the absence of a contrary showing in the record, all presumptions in favor of the trial court's action will be made by the appellate court.  "[I]f any matters could have been presented to the court below which would have authorized the order complained of, it will be presumed that such matters were presented." ' [Citation.]  This general principle of appellate practice is an aspect of the constitutional doctrine of reversible error. [Citation.] ' "A necessary corollary to this rule is that if the record is inadequate for meaningful review, the appellant defaults and the decision of the trial court should be affirmed." ' [Citation.]  'Consequently, [appellant] has the burden of providing an adequate record. [Citation.] Failure to provide an adequate record on an issue requires that the issue be resolved against [appellant].' " (*Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 187.)

There was no court reporter at the hearing on Elsie's motion to be appointed as temporary trustee and there is no settled statement of the hearing in the record.  Neither

37

the trial court's minute order nor the order after hearing contain any factual determinations or legal analysis explaining the court's decision to grant Elsie's motion. As the party challenging the order, Les has the burden to provide an adequate record for meaningful review and affirmatively demonstrate error. He has failed to do so. The record reflects that Elsie, aged 91, sought to be appointed as temporary trustee pending Les' appeal of the judgment because Les (along with members of his immediate family) were continuing to use the Property for their personal benefit (grazing cattle) and Les was not providing her with sufficient income from the trust. In opposing Elsie's motion, Les conceded that he was currently using the Property for cattle grazing, and did not deny that he had rejected Elsie's request for a $10,000 disbursement from the trust in May 2017. Instead, he argued that Elsie's motion is devoid of evidence that he did not distribute enough money to her. However, at trial, Les admitted that Elsie had received a $10,000 distribution from the trust on June 26, 2015, but did not receive any distribution thereafter during the third accounting period, i.e., from June 27, 2015 to June 30, 2017. His testimony was consistent with the third accounting he submitted to the trial court.

In the absence of an adequate record, we presume the trial court acted properly and determined that this is an exceptional case in which imminent injury or loss was clear and that Elsie should be appointed as temporary trustee. Where, as here, "no reporter's transcript has been provided and no error is apparent on the face of the existing appellate record, the judgment must be *conclusively presumed correct* as to *all evidentiary matters*. To put it another way, it is presumed that the unreported trial testimony would demonstrate the absence of error. [Citation.] The effect of this rule is that an appellant who attacks a judgment [or appealable order] but supplies no reporter's transcript will be precluded from raising an argument as to the sufficiency of the evidence." (*In re Estate of Fain* (1999) 75 Cal.App.4th 973, 992.) Les cannot carry his burden.

## DISPOSITION

The judgment is affirmed.  The trial court's order appointing Elsie as temporary trustee is affirmed.  Costs on appeal are awarded to Elsie.  (Cal. Rules of Court, rule 8.278(a).)


            /s/
          Duarte, J.



We concur:



        /s/
Hull, Acting P. J.



        /s/
Murray, J.